Stephen WILLIAMS et al.,
Plaintiffs-Appellants,

v.

Thomas KLEPPE et al.,
Defendants-Appellees.

No. 75–1332.

United States Court of Appeals,
First Circuit.

Argued April 7, 1976.
Decided July 30, 1976.

---

**804**

Alan Dershowitz, Cambridge, Mass., with whom Jeanne Baker, Rosenberg & Baker, and John Reinstein, Cambridge, Mass., were on brief, for appellants.

James J. O'Leary, Asst. U. S. Atty., Washington, D. C., with whom James N. Gabriel, U. S. Atty. and William E. Hughes, Asst. U. S. Atty., Boston, Mass., were on brief, for Thomas Kleppe, et al., appellees.

Ansel B. Chaplin, Boston, Mass., with whom Roger M. Barzun, Paul C. Irwin, and Chaplin, Barzun & Casner, Boston, Mass., were on brief, for Truro Neighborhood Ass'n, appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

■ Plaintiff-appellants, who wish to enjoy nude bathing at one of the more remote beaches of the Cape Cod Seashore National Park (Seashore), sought a declaration of unconstitutionality of the regulation of the National Park Service imposing a total ban on such activity. Officials of the Department of the Interior and the Park Service are defendants and an association of owners of residences within the Seashore, the Truro Neighborhood Association, was allowed to intervene.[1]

---

1. The action was brought under 28 U.S.C. § 1331(a). The jurisdictional amount was al-

leged and has not been made an issue. Applying conventional analysis, we are unwilling to

The site of this controversy is a beach known as Brush Hollow on the Atlantic shore of Cape Code, a three mile expanse between two conventionally operated beaches. For some forty or fifty years this spot, hidden behind some of the highest sand dunes on the Cape, had been used by individuals, couples, and small groups for skinny dipping. Apparently neither the town of Truro, in which Brush Hollow was located, nor the Commonwealth of Massachusetts sought to suppress this bucolic activity. Nor, after the creation of the Seashore in 1959, did the National Park Service.

By the 1970s the press of population was increasingly felt. In 1972 Brush Hollow attracted as many as 150 nude bathers in a day. The existence of the only "free beach" on the east coast became a matter for regional and national news coverage. In the summer of 1974 the average daily count of nude bathers was over 300, on weekends rising to 600, and attaining a peak of over 1200 on one day in August.

As the popularity of Brush Hollow built up, so did the concern of the owners of residential property within the Seashore and near points of access to the beach. Their complaints, *see infra*, stimulated the Park Service to appraise the alternatives open to it. Significant factors in the study of the Seashore Advisory Commission were the primary emphasis on conservation reflected in the classification of Brush Hollow as a non-managed area and the statutory mandate to consider the interests of owners of private property within the boundaries

of the Seashore.[2] Pursuant to the Congressional mandate that "the seashore shall be permanently preserved in its present state", 16 U.S.C. § 459b–6(b)(1), the Park Service had set aside all Seashore land for conservation except some trails, picnic areas, visitor centers, and six developed beaches.[3] Brush Hollow was classified as a Class III area, with primary emphasis on conservation, and, while some recreational use was contemplated, the beach was equipped with no organized facilities or services.

The Park Service, after considering other alternatives, including the allowance of nude bathing at other beaches, equipping Brush Hollow as a managed beach, and limiting access to Brush Hollow consistent with its Class III status, adopted the regulation at issue, 36 C.F.R. § 7.67(g), which bars public nude bathing within the Seashore to all persons over ten years of age. Suit was brought and hearing was had at which affidavits were accepted and evidence taken. The district court, although finding that "nude bathing at Brush Hollow is entitled to some constitutional protection", held that the regulation withstood constitutional challenge, the conditions prompting the regulation outweighing the right at issue. Appellants, standing on the finding of some constitutional interest, claim that no "outweighing" interest was established and that lesser restrictive alternatives were available.

The experiences of the summer of 1974 included, in addition to the accession of far greater numbers of nude bathers than ever before, demonstrable damage to the envi-

---

say on this record that the claimed interests of one or more plaintiffs, some being residents of the Seashore area, may not exceed the jurisdictional amount. Perhaps more realistically, we can rely on the extent of the claimed pecuniary burden on defendants were plaintiffs to prevail. *See*, for discussion of current authorities, Comment, *The Jurisdictional Amount in Controversy in Suits to Enforce Federal Rights*, 54 Texas L.Rev. 545, and particularly 553, 584–85 (1976).

2. In 16 U.S.C. § 459b–6(b)(2), the Secretary of the Interior was directed, in developing the Seashore, to "provide public use areas . . .

as . . . will not diminish for its owners and occupants the value or enjoyment of any improved property located within the seashore."

3. A developed or managed beach had lifeguard protection, bath houses, waste containers, sanitary facilities, parking accommodations, and boardwalk access paths over dunes. Such a beach would be in either a Class I area—High Density Recreation, or Class II area—General Recreation.

ronment,[4] increasing attendance despite attempts of enforcement,[5] record traffic congestion,[6] litter,[7] and trespassing.[8] On the other hand, appellants make the points that no attempt was made to enforce littering or trespass regulations; parking restrictions were feebly enforced; no attempt was made to limit access to beaches via stickers; no regulations forbad walking on dunes and vegetation; and signs announcing a nude beach were not utilized. Appellants further argue that it would cost the Park Service no more to limit access than to impose a total ban on nude bathing, and that, as yet, no one knows precisely where the danger point of environmental degradation is reached.

■ Appellants' attack on the total ban imposed by Seashore officials on nude bathing is not premised on procedural irregularities in its promulgation sufficient to deprive bathers of procedural due process. Rather, it is founded on the theory that they and their predecessors at Brush Hollow beach have, through their long tolerated practice of nude bathing, acquired a substantively protected constitutional right.[9] To quote from their brief, "[W]here

4. Gouges in the top of a dune, cuts into the slope of dunes, injury to vegetation on the slopes of dunes, destruction of roadside pine seedlings, and paths broadened by motorcycle tracks.

5. In the time of maximum attendance, the authorities issued 400 parking tickets, 50 notices for destruction of property, and 30 notices for illegal use of motorcycles.

6. Long lines for parking at beaches, large numbers of automobiles parked at roadside, jitney traffic to access points and groups waiting to be picked up, noise of motorcycles and busy traffic from 8 a.m. to 6 p.m.

7. Debris on the beach and in underbrush; excrement and flies noticed on warm days.

8. Driveways blocked, private property used as access, vehicles broken into, property stolen, cars (12–13) parked on private lawns, a camper parked overnight, owners verbally abused by trespassers, shrubs destroyed.

9. Plaintiffs have also claimed that their First Amendment rights of free speech and association were implicated and infringed. We agree

. . . as at Brush Hollow, tradition, custom and usage have given rise to the reasonable expectation that one may engage in a harmless, healthful activity outside the sight of those who might be offended without fear of harassment, arrest and prosecution, there exists a right to nudity." Plaintiffs do not claim that the right entitles them to be free from any restraint. They seek "only the right to continue their practice in numbers consonant with environmental needs *somewhere* within the Seashore." [Emphasis in brief.] They claim that this right, though acquired through prescription, is one of the smaller liberties entitled to substantive constitutional protection. Government encroachment is only authorized if the government interest involved is important and cannot be served by more selective or less restrictive measures.

In *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), the Court attempted a partial catalogue of the liberties encompassed by the Fourteenth Amendment.[10] Over time, as appellants note, the Court has afforded a high degree of protection to a number of liberties not specifically enumerated in the Constitution.

with the district court's conclusion that no rights of free speech can be said to have been involved here. *Richards v. Thurston,* 424 F.2d 1281, 1283 (1st Cir. 1970). A distinction must be made between groups concerned with discussing and promoting a pleasurable activity, and those gatherings of people merely desiring to pursue that activity where it can take place. If the latter groupings were considered association, independent of any speech element in the activity, the result would be constitutional double counting: to the particular interest at stake would be added the rights of speech and/or association involved in pursuing the interest.

10. "Without doubt, it denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." Such a catalogue is also relevant to cases like this one, involving the Fifth Amendment.

See, e. g., Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). And we have joined the lists of the courts which have recognized as a protectible, if minor interest, one's desire to wear his hair as he chooses—an individual right concerning one's own permanent appearance and life style. Richards v. Thurston, supra, 424 F.2d at 1281. But, as exemplified in recent cases, Kelley v. Johnson, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976); Paul v. Davis, 424 U.S. 693, 712, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976), there is a significant debate whether interests such as that advanced by the appellants should be accorded any substantive constitutional protection. However, we need not address this incandescent question to decide this case. Following the procedure recently utilized by the Supreme Court, Kelley v. Johnson, supra, we may assume for purposes of this case that appellants' interest in continuity in engaging in a pleasurable activity on public property must be afforded some measure of substantive constitutional protection.

Given this assumption, however, we have no doubt that the evidence presented below supports the district court's conclusion that the defendants' action was sufficiently justified. In our judgment, the defendants' actions can easily withstand the ordinary, relaxed standard of review, satisfied by a conceived rational relationship, see Kelley v. Johnson, supra; Williamson v. Lee Optical Co., 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Indeed, the record in this case establishes that barring nude bathing bears a real and substantial relationship to the objectives of the Seashore. There were very real threats to the continued fulfillment of the Seashore's conservation purposes, and the action taken, after consideration of some eight alternatives, served those purposes. Therefore, if the interest asserted by appellants were considered of sufficient importance to justify a form of intermediate review, as envisioned in Richards v. Thurston, supra, we would have to hold that the government had discharged its burden and established a rationale which outweighed appellants' interest.

Only if the interest in nude bathing were considered fundamental would appellants prevail. In the event, the opinion of the Seashore Supervisor that alternative approaches would require increased expenditures might be deemed inadequate. And defendants might be under a duty to demonstrate, by more specific data, the infeasibility of more selective solutions to the problems engendered by the nude bathers. We see no basis for imposing such a duty. It cannot be maintained that the asserted interest falls into that narrow category of claims involving, "freedom of choice with respect to certain basic matters of procreation, marriage, and family life", Kelley v. Johnson, supra, 425 U.S., at 244, 96 S.Ct., at 1444, which the government may not invade absent compelling reason, and without exhaustion of less restrictive alternatives. It is clear that the Fifth Amendment liberties requiring the kind of protection urged here by appellants do not encompass the right to bathe in the nude at the Cape Cod Seashore National Park.

Judgment of district court is affirmed.